1   Timothy M. McCloskey (*Pro Hac Vice*)
    John Roberson (*Pro Hac Vice*)
2   Blake E. Rizzo (*Pro Hac Vice*)
    Carrigan McCloskey & Roberson, L.L.P.
3   5300 Memorial, Suite 700
    Houston, Texas 77007
4   Telephone: (713) 337-3919
    Facsimile: (713) 868-1275
5   brizzo@cmrllp.com

6   Paul R. Kiesel (SBN 119854)
    Kiesel Boucher Larson
7   8648 Wilshire Blvd.
    Beverly Hills, CA 90211
8   Telephone: (310) 854-4444
    Facsimile: (310) 854-0812
9   kiesel@kbla.com

10   Attorneys for Plaintiff,
    CONVERGENCE ETHANOL, INC,
11   (BY AND THROUGH RONALD J.
    SOMMERS, CHAPTER 7 TRUSTEE)

12

13

               UNITED STATES DISTRICT COURT

14

             CENTRAL DISTRICT OF CALIFORNIA

15

                  WESTERN DIVISION

16

17

| | |
|---|---|
| 18 CONVERGENCE ETHANOL, INC., a Nevada corporation, | Case No. CV 06-07971 |
| 19         Plaintiff, | [The Honorable George H. Wu] |
| 20         v. | **FIRST AMENDED COMPLAINT FOR:** |
| 21 DANIEL MOSCARITOLO, an individual; and DOES 1-10, | (1) **VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934;** |
| 22         Defendants. | (2) **DECLARATORY RELIEF;** |
| 23 | (3) **BREACH OF FIDUCIARY DUTIES;** |
| 24 | (4) **INTENTIONAL INTERFERENCE WITH CONTRACT;** |
| 25 | (5) **CONVERSION; and** |
| 26 | (6) **UNJUST ENRICHMENT** |

27

28

1    Plaintiff, Ronald J. Sommers, Chapter 7 Trustee for the Estate of

2  Convergence Ethanol, Inc. ("Convergence") alleges as follows:

3                                          **PARTIES**

4         1.    Convergence is a corporation organized and existing under the laws

5  of the State of Nevada with its principal place of business in Westlake Village,

6  California. Until a recent change of name, Convergence was known as "MEMS USA,

7  Inc." ("MEMS"). Convergence filed bankruptcy on December 21, 2007. Ronald J.

8  Sommers has been appointed as the Chapter 7 Trustee for the Estate of Convergence

9  Ethanol, Inc.

10        2.    On information and belief, defendant Daniel Moscaritolo is an

11 individual residing in Thousand Oaks, California. Moscaritolo will be served with this

12 First Amended Complaint through his attorney of record, Laura G. Brys, Burris,

13 Schoenberg & Walden LLP, 12121 Wilshire Blvd., Suite 800, Los Angeles, CA 90025-

14 1171.

15        3.    On information and belief, defendant Dr. James Latty is an

16 individual residing in Westlake Village, California. Latty will be served with this First

17 Amended Complaint through his attorney of record, Steven S. Newsom, 12000

18 Westheimer Rd., Suite 232, Houston, Texas 77077.

19        4.    The true names and capacities of the defendants sued herein as

20 Does 1 through 10 are not known to Convergence, which therefore sues said defendants

21 by such fictitious names. Does 1 through 10 are the agents, co-conspirators or joint

22 venturers of Defendants and are acting in concert or participation with them in

23 connection with the violations alleged herein. Convergence will amend this Complaint

24 to allege their true names and capacities when the same are ascertained.

25                              **JURISDICTION AND VENUE**

26        5.    The Court has subject matter jurisdiction over this action pursuant to

27 28 U.S.C. § 1331 because this action arises under the securities laws of the United

28 States, 15 U.S.C. § 78a, *et seq.* The Court has supplemental jurisdiction over the state

- 1 -

FIRST AMENDED COMPLAINT

1   law claims alleged herein pursuant to 28 U.S.C. § 1367.  Venue lies in this district

2   pursuant to 28 U.S.C. § 1391(a) because Moscaritolo and Latty reside within this

3   district.

## BACKGROUND ALLEGATIONS

### Moscaritolo's Improper Campaign to Take Control of Convergence

6.  Defendant Daniel Moscaritolo ("Moscaritolo") was an employee of Convergence from February 16, 2004 until November 17, 2006, by which time he was the company's Chief Operating Officer, Chief Technology Officer and head of Human Resources.  Moscaritolo was also a member of its Board of Directors until his resignation on November 14, 2006.

7.  Beginning in or about July 2006, Moscaritolo improperly began a campaign to seize control of Convergence.  On information and belief, Moscaritolo's actions were taken without any care to the best interests of Convergence's shareholders, but instead were taken solely for his own personal benefit.  On information and belief, while still an employee and director of Convergence, Moscaritolo communicated with numerous third-party investors of Convergence in an attempt to solicit proxies for a shareholder vote to take control of Convergence.

### Moscaritolo's Interference With Company Efforts to Secure Financing

8.  While an officer of Convergence, Moscaritolo repeatedly interfered with the company's efforts to obtain financing, thereby breaching his duty of loyalty. His stated intention in doing so was to put Convergence in serious financial peril such that its shareholders would place Moscaritolo in the positions of President, Chief Executive Officer and Chairman of the Board of Directors. Moscaritolo's misconduct directly led to the termination of discussions with Silverhawk Capital Partners, LLC (of Greenwich, CT), which, in September 2006, was on the verge of providing $17.5 million in financing to a Canadian corporation owned 87% by Convergence, known as Hearst Ethanol One.  Similarly, the Laurus Capital Group (of New York, NY) had

- 2 -

1  offered in September 2006 to provide $5 million in much-needed capital directly to
2  Convergence, but, on information and belief, Moscaritolo prevented Laurus from
3  completing its due diligence, which led to the immediate termination of its negotiations
4  with Convergence.   Finally, Moscaritolo interfered with Convergence's attempt to
5  obtain financing from Low Carbon Accelerator and/or its parent Low Carbon Initiative
6  LLP and Global Capital Advisors, LLC for the purpose mentioned above.

7          9.      Unbeknownst to Convergence's executive officers at the time, on
8  August 10, 2006, Moscaritolo also improperly obtained a copy of Richard York's
9  e-mail records for the previous thirty day period.   Mr. York is the Chief Financial
10 Officer of Convergence.  On information and belief, Moscaritolo violated York's right
11 of privacy in order to, among other things, discover additional details regarding
12 Convergence's efforts to secure financing.   Moreover, in or about November 2006,
13 Moscaritolo attempted to obtain York's most recent email messages.

14          **Moscaritolo's Interference With Company Business Opportunities**

15          10.     Moscaritolo also directly interfered with the crown jewel of
16 Convergence's business – its "Hearst Ethanol One" venture for the development of an
17 ethanol plant in Ontario, Canada.  On information and belief, Moscaritolo informed the
18 minority shareholder of the Hearst Ethanol One holding corporation, Claude Villaneuve
19 (and other Canadian stakeholders in the project), that Convergence personnel had
20 deliberately misrepresented the potential earning capabilities of the joint venture once
21 the ethanol plant becomes operational.  Moscaritolo's assertions of fact in that regard
22 were demonstrably false.

23          11.     In addition, Convergence entered into an agreement with a company
24 that has offered to license to Convergence its technology for use in the Hearst Ethanol
25 One project.   In connection therewith, that company provided Convergence with a
26 confidential written report.   On information and belief, in or about October 2006,
27 Moscaritolo traveled to that company with Claude Villaneuve and convinced him that
28 he could obtain the technology necessary to build an ethanol plant without

FIRST AMENDED COMPLAINT

1  Convergence's participation.  On information and belief, Moscaritolo did so in order to
2  convince Mr. Villaneuve that he should deal with Moscaritolo rather than Convergence
3  management, and/or that Mr. Villaneuve should enter into a new joint venture with
4  Moscaritolo, to the exclusion of Convergence.   Since the October 2006 meeting
5  between Moscaritolo and Mr. Villaneuve, Mr. Villaneuve has refused to communicate
6  with Convergence's management.

7         12.    Likewise, Moscaritolo interfered with the CDI/Chevron (El
8  Segundo) IFS project that Convergence had with an affiliate of Chevron Corporation by
9  urging the lead engineer to resign from Convergence or at a minimum refuse to perform
10 his duties on the project.  Moscaritolo's goal was to cause Convergence to breach its
11 obligations on the project.

12         **Moscaritolo's Retention of Personal Counsel at Company Expense**

13         13.    Furthermore, in October 2006, Moscaritolo presented Mr. York with
14 a contract dated as of August 8, 2006, purportedly evidencing Convergence's retention
15 of an attorney named Alan Shifman as the corporation's outside legal counsel.  After
16 execution of that engagement agreement, on or about September 18, 2006, Moscaritolo
17 hired Shifman as the corporation's "in-house" counsel, at the rate of $10,000 per
18 month.

19         14.    The hiring of Shifman as outside or "in-house" counsel was never
20 presented to or authorized by Convergence's Board of Directors.  On information and
21 belief, Moscaritolo hired Shifman to represent his interests, and not the corporation's.
22 Indeed, to this day, Convergence is unaware of <u>any</u> services that Shifman provided to
23 the corporation.

24         15.    When Mr. York refused to issue payment by Convergence to
25 Shifman for his services rendered to Moscaritolo, Shifman threatened to bring suit
26 immediately.  He stated that his intention in doing so would be to "kill" a financing
27 transaction that Convergence required in order to stave off bankruptcy.  Under duress,
28 on or about October 30, 2006, Convergence entered into a "Separation Agreement and

FIRST AMENDED COMPLAINT

1  Release" with Shifman and paid him $38,952.96, in exchange for "cancellation" of his
2  alleged employment contract.

3  ### Moscaritolo's Willful Dereliction of Duty

4        16.    Beginning in July 2006, Moscaritolo refused to perform his duties as
5  Chief Operating Officer of Convergence. In addition, Moscaritolo failed to properly
6  perform his duties in overseeing the operations of Gulfgate Equipment, Inc.
7  ("Gulfgate") and Bott Equipment Co., Inc., ("Bott"), subsidiaries of Convergence. In
8  particular, both Gulfgate and Bott had been profitable for over thirty-five years before
9  Moscaritolo was charged with oversight of their operations. After two years of
10  Moscaritolo's oversight, Bott's profits had fallen dramatically and Gulfgate reported
11  huge losses. Although written demands were made to Moscaritolo, he ignored those
12  demands and willfully ignored his job duties.

13  ### Moscaritolo's Resignation and Termination

14        17.    On November 14, 2006, Moscaritolo transmitted a written
15  correspondence to Convergence wherein he resigned his position on the Board of
16  Directors. In addition, on November 17, 2006, the Board of Directors of Convergence
17  terminated Moscaritolo's employment for cause. Moreover, Moscaritolo has failed to
18  return Convergence's property, including a company credit card, a company laptop
19  computer, the technical report referenced in paragraph 10 above, and numerous other
20  internal company documents and materials, despite several demands by Convergence.

21  ### Moscaritolo's Violations of the Securities Laws

22        18.    As alleged in paragraph 6, above, on information and belief,
23  Moscaritolo began to solicit shareholder proxies from third-party investors in
24  Convergence while still an employee of the corporation, in an attempt to take control of
25  Convergence.

26        19.    On December 13, 2006, Moscaritolo arrived at Convergence's
27  headquarters in Westlake Village, California, with a stack of shareholder proxies
28  purporting to represent more than 67% of Convergence's shares held by 152 different

- 5 -

1  shareholders.  A true and correct copy of one of the proxies is attached as Exhibit A and
2  incorporated herein as if it had been set forth at length.  Moscaritolo also hand-
3  delivered to Mr. York a letter dated December 13, 2006, informing Mr. York as
4  Secretary of Convergence that "on behalf of the holders of two thirds of the outstanding
5  shares of stock" in Convergence, he and several of his associates had removed from
6  office the two existing directors of Convergence and that Moscaritolo and an individual
7  named Thomas Hemingway had been voted in office to replace them.  A true and
8  correct copy of the December 13, 2006 letter is attached as Exhibit B and incorporated
9  herein as if it had been set forth at length.  Moscaritolo also brought a locksmith with
10  him and represented that he was taking over Convergence and planned to change the
11  locks on the company doors.

12       20.    As a preliminary matter, the December 13, 2006 letter delivered to
13  York was incorrect, as Moscaritolo and his agents failed to obtain the votes of two-
14  thirds of the outstanding shares of Convergence's stock to effect the termination of
15  Convergence's directors (as required by Section 3.5 of the corporation's by-laws, a true
16  and correct copy of which is attached as Exhibit C and incorporated herein as if it had
17  been set forth at length).  The December 13, 2006 letter states that there are 16,922,987
18  shares outstanding.  In fact, there are a far greater number of Convergence shares
19  outstanding, and the proxies that Moscaritolo purports to have secured represented less
20  than 66 2/3% of the shares outstanding.

21       21.    Neither Moscaritolo nor any other party ever registered any proxy
22  solicitation statements, or the form of proxy, with the United States Securities and
23  Exchange Commission (the "SEC"), as required by Section 14 of the Securities
24  Exchange Act of 1934 and the Rules and Regulations promulgated pursuant thereto.
25  Accordingly, the proxies he and his agents obtained are void.

26       22.    In addition, Moscaritolo personally owns in excess of five percent
27  (5%) of Convergence's outstanding shares, but, on information and belief, he never
28  filed any Schedule 13D statement to that effect with the SEC, as required by Section

FIRST AMENDED COMPLAINT

1 13(d) of the Securities Exchange Act of 1934. Section 13(d) also required Moscaritolo

2 and his associates to amend said disclosures to reflect that they have been acting in

3 concert as part of a "group" to effect a change in control. Further, Section 13(d)

4 independently prohibited Moscaritolo from communicating with Convergence's

5 shareholders absent his preparation, filing with the SEC, and subsequent distribution of

6 appropriate proxy statements.

7      23.   The federal securities laws were intended to preclude the

8 surreptitious gamesmanship attempted by Moscaritolo. The actions by him and his

9 agents complained of herein have damaged and will continue to damage Convergence

10 irreparably. Convergence has no adequate remedy at law for these wrongs and injuries.

11 Convergence is therefore entitled to a preliminary and permanent injunction restraining

12 and enjoining Moscaritolo and his agents, servants and employees, and all persons

13 acting thereunder, in concert with, or on their behalf, from further actions in furtherance

14 of their attempt to effect a change in control of Convergence in reliance on the proxies

15 obtained in violation of the federal securities laws.

16 **Latty's Self-dealing in and Interference with the Accelon Transaction**

17      24.   In July of 2002, Convergence, then MEMS, hired as its president

18 Dr. James Latty, who represented that he could and would turn the MEMS concept into

19 a profitable venture.

20      25.   In the early months of 2003, Latty announced that he was

21 negotiating with a U. S. subsidiary of a Canadian company, which he referred to only

22 as "Accelon," for a contract to design, engineer and build an equipment package known

23 as a "blending skid" for $85,000.00. Documents confirm that it was Latty who brought

24 the Accelon opportunity to MEMS.

25      26.   While apparently there is an independent Canadian corporation

26 called "Accelon Energy System, Inc.," with whom Latty has had longstanding ties, the

27 "Accelon" entity referred to by Latty in 2003 was a Nevada company that Latty had

28 himself incorporated and that was owned and controlled by Latty and/or his immediate

FIRST AMENDED COMPLAINT

1  family.  Indeed, draft bid solicitation letters for the blending skid project identified
2  Accelon's Executive Vice President as "C.A. Lombardi" – which are the initials and
3  maiden name of Dr. Latty's wife.   The same "C.A. Lombardi" signed contract
4  documents for the transaction on or about March 14, 2003.  As was later discovered,
5  Accelon shared office space with another Latty company, JAL Engineering, also
6  located in Westlake Village, California, and Latty's wife signed checks for Accelon.

7          27.    Plaintiff believes that Latty set up the "Accelon Nevada"
8  corporation and used the entity in this instance to confuse and deceive the officers and
9  shareholders of MEMS.  While hyping the financial promise of the transaction to
10 MEMS, he failed to disclose the business relationship between himself and/or his wife
11 and Accelon.  He insisted that he alone was to negotiate with Accelon in secret, and
12 others at MEMS were not allowed to meet any Accelon Canada or Accelon Nevada
13 personnel.  He worked on the transaction out of his residence and kept many files there,
14 rather than at the MEMS Westlake offices.  He forced the execution of a contract
15 containing very strict confidentiality clauses, which forbade anyone associated with
16 MEMS from disclosing any aspect of the contract to any third party, and in the process
17 failed and refused to disclose any details regarding the Accelon entity due to alleged
18 confidentiality issues.  Ultimately, Latty's son, Jason Latty, acquired the corporate
19 assets of Accelon Nevada.

20         28.    Latty also stated in these discussions that Accelon Canada
21 demanded ownership of all of the engineering designs and accompanying work and
22 that, contrary to MEMS's expressed policy, MEMS would have no ownership interest
23 in the design of the product. A contract incorporating send terms for the development of
24 the skids was signed and implemented at Latty's instigation.

25         29.    Various documents confirm that Latty had the lead role within the
26 company in implementing the blending skid project.  In the course of that work, Latty
27 refused to bill Accelon Nevada for numerous client-generated design changes, insisting
28 that MEMS itself absorb all such costs, allegedly in the interest of maintaining the

- 8 -

FIRST AMENDED COMPLAINT

1   client relationship.  Such action was contrary to industry standards and practice.  In
2   emails in which he advocated against attempting to pass costs overruns on to Accelon,
3   Latty again failed to mention the existence of a business relationship between Accelon
4   and himself or any other member of his family.  Nor were any of the opinions he offered
5   about fairness to Accelon qualified by any statement about any financial interest that he
6   or members of his family may have had in the transaction.  Ultimately, based on Latty's
7   input, MEMS decided to stick with its fixed price on the blending skid, with cost
8   overruns exceeding $180,000.

9          30.    Accelon Canada's management was willing to purchase ninety-one
10  skids for $165,000 with no monthly royalty.  According to a press release dated April
11  15, 2004, Convergence expected purchase orders of over $10,000,000 for the following
12  eighteen months.  However, Latty, through Accelon Nevada and unbeknownst to
13  MEMS, instead demanded $250,000 per unit and a $20,000 per month royalty.
14  Accelon Canada ultimately ordered no skid units, and MEMS lost substantial potential
15  revenues as a result of Latty's self-dealings and breaches of duty.

16         31.    In addition, in September 2004, Convergence and Accelon Canada
17  entered into a joint venture to engineer, design, procure, build, own, operate and
18  maintain a biomass-to-ethanol processing plant in Canada.  The preliminary budget for
19  the plant was $150,000,000 with a projected production capacity of 160,000 gallons of
20  synthesized ethanol per day.  Convergence was to act at the general contractor of the
21  project.  In November 2004, Can-Am Ethanol One ("Can-Am") was incorporated in
22  Canada with Convergence and Accelon Canada each owing 50%.  In December 2004,
23  Convergence was to begin design and engineering of the project.  This phase of the
24  project was budgeted at $15 to $17 million.  Construction of the plant was to begin in
25  late 2005.  The construction budget was estimated at $120 to $125 million.  In June
26  2005, Can-Am entered into an agreement to purchase a plant site in Comox Valley
27  region of Vancouver Island, British Columbia, Canada.  As a result of Latty's self-
28  dealing and breaches of duty, the Can-Am project never came to fruition.

FIRST AMENDED COMPLAINT

1 | **Latty's Interference with Company Efforts to Secure Financing**

2 |      32.    Convergence believes that Latty failed to use the skill, judgment and

3 | care of a reasonably competent officer in obtaining funding for Convergence.

4 | Convergence believes that Latty also interfered with its efforts to obtain funding from

5 | Silverhawk by refusing to meet with Silverhawk representatives at a pre-arranged

6 | meeting. In addition, Latty interfered with and/or neglected his duties in securing $3

7 | million in funds from RAM Funding. Despite substantial efforts by the company in

8 | securing the RAM funding, Latty failed to appear at the pre-arranged closing to secure

9 | the funding.

10 | **Corporate Waste, Mismanagement and Deepening Insolvency**

11 |      33.    During their tenure as officers and directors of Convergence,

12 | Moscaritolo and Latty engaged in a series of grossly negligent and/or intentional acts

13 | and omissions that injured Convergence. Moscaritolo and Latty failed to exercise due

14 | care, engaged in corporate waste and mismanagement and deepened the insolvency of

15 | Convergence by (i) failing to take advantage of available business opportunities; (ii)

16 | conferring excessive salaries upon themselves; (iii) wrongfully dissipating assets and

17 | fraudulently expanding corporate debt and prolonging Convergence's life which

18 | resulted in the loss of corporate value and the precipitous decline of Convergence's

19 | stock price.

20 |      34.    Through their management and governance of Convergence – both

21 | in terms of action and a failure to act – Moscaritolo and Latty harmed Convergence

22 | and, as a result, are legally liable to Convergence for damages.

23 | **FIRST CLAIM FOR RELIEF**

24 | (Violations of the Securities Exchange Act of 1934)

25 | (Against Moscaritolo and Does 1-10)

26 |      35.    Convergence hereby realleges and incorporates by reference the

27 | allegations set forth in paragraphs 1 through 34, above.

28 |

36.    As alleged above, the shares of Convergence are publicly traded on a national exchange, the OTC Bulletin Board System.

37.    As alleged above, Moscaritolo and his associates or agents solicited and obtained proxies from holders of Convergence stock in violation of Sections 13 and 14 of the Securities Exchange Act of 1934 and the Rules promulgated by the SEC pursuant thereto.

38.    In addition, as alleged above, Moscaritolo has failed to disclose his Convergence shareholdings to the SEC in a Schedule 13D report (and also failed to amend it to reflect his acting in concert with other shareholders as part of a "group"), in violation of Section 13 of the Securities Exchange Act of 1934.

39.    Convergence is entitled to enforce the provisions of Sections 13 and 14 of the Securities Exchange Act of 1934 on its own behalf and/or on behalf of its shareholders. Therefore, Convergence requests that this Court issue a preliminary and permanent injunction restraining and enjoining Moscaritolo and his agents, servants and employees, and all persons acting thereunder, in concert with, or on their behalf, from further actions in furtherance of their attempt to effect a change in control of Convergence in reliance on the invalid proxies obtained in violation of the federal securities laws.

40.    The Court should also award the attorneys' fees and costs incurred to bring this suit.

## SECOND CLAIM FOR RELIEF

(Declaratory Judgment)

(Against Moscaritolo and Does 1-10)

41.    Plaintiff hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 34, above.

42.    There is an actual and continuing controversy between Convergence, on the one hand, and Daniel Moscaritolo and his agents, on the other

FIRST AMENDED COMPLAINT

1   hand, regarding the validity of the shareholder proxies they surreptitiously obtained in

2   violation of the federal securities laws, as alleged above.

3          43.    Therefore, Convergence requires, and hereby demands pursuant to

4   28 U.S.C. § 2201, a declaratory judgment that the proxies are invalid.

5          44.    The Court should also award the attorneys' fees and costs incurred

6   to bring this suit.

### THIRD CLAIM FOR RELIEF

(Breach of Fiduciary Duties)

(Against Moscaritolo)

10         45.    Convergence hereby realleges and incorporates by reference the

11  allegations set forth in paragraphs 1 through 34, above.

12         46.    Moscaritolo was an officer of Convergence from February 16, 2004,

13  until November 17, 2006, and was therefore a fiduciary of Convergence.

14         47.    As described above, Moscaritolo repeatedly and intentionally

15  breached his fiduciary duties to Convergence.  Among other things, Moscaritolo:  (a)

16  engaged in a self-interested campaign to replace Dr. Latty as Chief Executive Officer of

17  Convergence, solely for his own self-aggrandizement; (b) intentionally interfered with

18  the corporation's efforts to obtain critically important financing; (c) violated the Chief

19  Financial Officer's right of privacy; (d) interfered with Convergence's Hearst Ethanol

20  One project; (e) retained legal counsel on Convergence's behalf without authorization

21  from the corporation's Board of Directors and so that the attorney would represent his

22  interests rather than the interests of the corporation; (f) breached his duty of care by

23  failing to perform his job duties; and (g) improperly retained company property

24  following his resignation and the termination of employment.

25         48.    The aforementioned breaches of fiduciary duties have proximately

26  caused damage to Convergence, in an amount to be proved at trial.  Convergence is also

27  entitled to an award of punitive damages pursuant to Cal. Civ. Code § 3294 because

28

FIRST AMENDED COMPLAINT

1  Moscaritolo is guilty of fraud and/or malice, as defined therein. The Court should also
2  award the attorneys' fees and costs incurred to bring this suit.

3  **FOURTH CLAIM FOR RELIEF**

4  (Intentional Interference with Contract)

5  (Against Moscaritolo)

6  49. Convergence hereby realleges and incorporates by reference the
7  allegations set forth in paragraphs 1 through 34, above.

8  50. There is an existing contract and prospective business relationship
9  between Convergence and an individual regarding their Hearst Ethanol One project.
10 There is also an existing contract and prospective business relationship between
11 Convergence and certain persons or entities referenced in paragraph 10, above,
12 regarding the licensure of technology for use in the corporation's ethanol plant project.
13 There was also a prospective economic relationship between Convergence and various
14 financiers, as alleged above.

15 51. Moscaritolo knowingly and intentionally interfered with these
16 contracts and disrupted Convergence's relationships with these third-parties. Among
17 other things, Moscaritolo's interference was accompanied by defamation and by
18 breaches of his fiduciary duties to Convergence.

19 52. Convergence has suffered foreseeable damages proximately caused
20 by Moscaritolo's interference, in an amount to be proved at trial. Convergence is also
21 entitled to an award of punitive damages pursuant to Cal. Civ. Code § 3294 because
22 Moscaritolo is guilty of fraud and/or malice, as defined therein. The Court should also
23 award the attorneys' fees and costs incurred to bring this suit.

24 **FIFTH CLAIM FOR RELIEF**

25 (Conversion)

26 (Against Moscaritolo)

27 53. Convergence hereby realleges and incorporates by reference the
28 allegations set forth in paragraphs 1 through 34, above.

FIRST AMENDED COMPLAINT

1    54.    Moscaritolo has improperly retained property owned by
2  Convergence and refused to return it, as described more fully in, for example,
3  paragraph 17, above. Moscaritolo also has retained copies of email messages belonging
4  to the corporation's Chief Financial Officer, without his or Convergence's permission.

5    55.    Convergence has suffered damages on account of Moscaritolo's
6  conversion of its property, in an amount to be proved at trial. Convergence is also
7  entitled to an award of punitive damages pursuant to Cal. Civ. Code § 3294 because
8  Moscaritolo is guilty of fraud and/or malice, as defined therein. The Court should also
9  award the attorneys' fees and costs incurred to bring this suit.

10                          **SIXTH CLAIM FOR RELIEF**

11                          (Breach of Fiduciary Duties)

12                          (Against James Latty)

13    56.    Convergence hereby realleges and incorporates by reference the
14  allegations set forth in paragraphs 1 through 34, above.

15    57.    At the time that Latty became associated with MEMS as an officer,
16  director, and employee, he assumed the responsibility to act in the best interests of
17  MEMS without regard to his own interests and claims.

18    58.    As described above, Latty repeatedly and intentionally breached his
19  fiduciary duties to Plaintiff. Among other things, Latty: (a) established Accelon
20  Nevada, through which he worked in competition with MEMS; (b) failed to disclose his
21  dual role as an officer of MEMS and as a principal of Accelon; (c) negotiated with
22  Accelon Canada on behalf of Accelon Nevada rather than on behalf of MEMS; (d)
23  deliberately inflated costs of the skids, thereby dissuading Accelon Canada from
24  purchasing the products; (e) wrongfully interfered with  MEMS's contractual
25  relationship with Accelon Canada by preventing MEMS from signing a fair and
26  reasonable contract; (f) diverted, to Accelon Nevada, money Accelon Canada would
27  have paid to MEMS; (g) deprived MEMS of business opportunities, assets, and
28  intellectual property belonging to and controlled by MEMS.

- 14 -

59.    The aforementioned breaches of fiduciary duties have proximately caused damage to Convergence, in an amount to be proved at trial. Convergence is also entitled to an award of punitive damages pursuant to Cal. Civ. Code § 3294 because Latty is guilty of fraud and/or malice, as defined therein. The Court should also award the attorneys' fees and costs incurred to bring this suit.

**SEVENTH CLAIM FOR RELIEF**

(Intentional Interference with Contract)

(Against James Latty)

60.    Convergence hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 34, above.

61.    Convergence had prospective business relationships with certain financiers, namely Silverhawk and RAM Funding, to obtain financing for Convergence projects, as alleged in paragraph 32 above.

62.    Latty knowingly and intentionally interfered with these contracts and disrupted Convergence's relationships with these third-parties. Among other things, Latty's interference was accompanied by defamation and by breaches of his fiduciary duties to Convergence.

63.    Convergence has suffered foreseeable damages proximately caused by Latty's interference, in an amount to be proved at trial. Convergence is also entitled to an award of punitive damages pursuant to Cal. Civ. Code § 3294 because Latty is guilty of fraud and/or malice, as defined therein. The Court should also award the attorneys' fees and costs incurred to bring this suit.

**EIGHTH CLAIM FOR RELIEF**

(Conversion)

(Against James Latty)

64.    Convergence hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 34, above.

65.     Latty took money that Accelon Canada would have paid to MEMS and wrongfully diverted such money to Accelon Nevada. Latty used such funds for his own use and benefit and not for the use and benefit of MEMS.

66.     By converting the monies that would have been paid by Accelon Canada to MEMS, Latty is guilty of conversion.

67.     Plaintiff has suffered damages on account of Latty's conversion of its property, in an amount to be proved at trial. Plaintiff is also entitled to an award of punitive damages pursuant to Cal. Civ. Code § 3294 because Latty is guilty of fraud and/or malice, as defined therein. The Court should also award the attorneys' fees and costs incurred to bring this suit.

### NINTH CLAIM FOR RELIEF

(Unjust Enrichment)

(Against James Latty)

68.     Convergence hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 34, above.

69.     Latty engaged in numerous actions designed to enrich himself at the expense of MEMS by concealing his relationships with Accelon Nevada and Accelon Canada, through which Latty intended to and did make money for his own enrichment.

70.     The monies Latty received and extracted from Accelon Canada should have been earned through and for MEMS. As a result of his wrongful actions in concealing his relationship with Accelon Nevada, Latty was unjustly enriched.

71.     Plaintiff has suffered damages on account of Latty's unjust enrichment, in an amount to be proved at trial. Plaintiff is also entitled to an award of punitive damages pursuant to Cal. Civ. Code § 3294 because Latty is guilty of fraud and/or malice, as defined therein. The Court should also award the attorneys' fees and costs incurred to bring this suit.

## TENTH CLAIM FOR RELIEF

### (Deepening Insolvency)

### (Against Both Defendants)

72.   Convergence hereby realleges and incorporates by reference the allegations set forth in paragraphs 1 through 34, above.

73.   As stated above, Moscaritolo and Latty were officers of Convergence and thus owed a fiduciary duty to Convergence.

74.   Moscaritolo and Latty failed to exercise due care, engaged in corporate waste and mismanagement and deepened the insolvency of Convergence by (i) failing to take advantage of available business opportunities; (ii) conferring excessive salaries upon themselves; (iii) wrongfully dissipating assets and fraudulently expanding corporate debt and prolonging Convergence's life which resulted in the loss of corporate value and the precipitous decline of Convergence's stock price.

75.   Convergence has suffered damages on account of Moscaritolo and Latty's actions and/or failures to act, in an amount to be proved at trial. Plaintiff is also entitled to an award of punitive damages pursuant to Cal. Civ. Code § 3294 because Moscaritolo and Latty are guilty of fraud and/or malice, as defined therein. The Court should also award the attorneys' fees and costs incurred to bring this suit.

## PRAYER FOR RELIEF

WHEREFORE, Ronald J. Sommers, Chapter 7 Trustee for the Estate of Convergence Ethanol, Inc. respectfully requests that this Court enter judgment in its favor and against Daniel Moscaritolo, James Latty, and Does 1-10, and grant the following relief:

A.   That Daniel Moscaritolo, as well as all persons acting under the direction, control, permission, or authority of Daniel Moscaritolo, or any of them, and all persons acting in concert therewith, be enjoined during the pendency of this action, and permanently thereafter, from any further attempts to effect a change in control of

FIRST AMENDED COMPLAINT

1 | Convergence's management and/or Board of Directors in reliance on the invalid
2 | proxies they obtained in violation of the federal securities laws;

3 |        B.     That the Court issue a declaration that the Convergence proxies
4 | obtained by Moscaritolo and his agents are invalid;

5 |        C.     That Daniel Moscaritolo, as well as all persons acting under the
6 | direction, control, permission, or authority of Daniel Moscaritolo, or any of them, and
7 | all persons acting in concert therewith, be ordered to convey to Convergence all of the
8 | company property and materials remaining in his possession;

9 |        D.     That the Court enter an award of damages against Daniel
10 | Moscaritolo and James Latty and in favor of Convergence in an amount according to
11 | proof at trial;

12 |        E.     That the Court enter an award of punitive damages against Daniel
13 | Moscaritolo and James Latty and in favor of Convergence;

14 |        F.     That the Court enter an award against Daniel Moscaritolo and James
15 | Latty of Convergence's attorneys' fees and costs incurred in bringing this action; and

16 |        G.     That the Court award such other relief as it may deem appropriate
17 | and just under the circumstances.

DATED:  July 7, 2008

CARRIGAN, McCLOSKEY &
ROBERSON LLP

By _____
Blake E. Rizzo
Attorneys for Plaintiff
Convergence Ethanol, Inc.

- 18 -

FIRST AMENDED COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2

3          Plaintiff hereby demands trial by jury pursuant to <u>Fed. R. Civ. Proc.</u> §

4    38(b).

5

6    DATED:  July 7, 2008              CARRIGAN, McCLOSKEY &
                                       ROBERSON LLP
7

8                                      By
9                                           Blake E. Rizzo
                                       Attorneys for Plaintiff
10                                     Convergence Ethanol, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 19 -

Exhibit A

*This ~~proxy~~ is provided by the Undersigned Shareholder of ~~MEMS~~ USA, Inc.*

The undersigned hereby appoints Daniel Moscaritolo as Proxy, with the power to appoint a substitute, and hereby authorizes him to represent and to vote all the Common Stock and/or Preferred Stock of MEMS USA, Inc. (the "Company") held of record by the undersigned at the close of business on today's date, for any meetings whether special or annual, for one year from the date of this grant of proxy, whether for any such meetings, or any postponements or adjournments thereof or to provide written consent in lieu of a meeting of shareholders with respect to the following issues:

    1.      Removal of all directors of the Company, including, without limitation, the Chairman of the Board of Directors; and

    2.      Election of Thomas Hemingway and Daniel K. Moscaritolo as directors of the Company.

THIS PROXY, WHEN PROPERLY EXECUTED, WILL AUTHORIZE SAID PROXY TO CAST ANY AND ALL BALLOTS IN A MANNER TO BE DETERMINED IN HIS SOLE DISCRETION FOR ALL MATTERS TO come before any such meeting, or any postponements or adjournments thereof, and the Proxy is authorized, at his discretion, to vote on the matters.

Signature: _____ . PRESIDENT

Print Name: COHEE CAPITAL MANAGEMENT

Date: _____ 11 - 22 - 2006 _____

Shares Beneficially Owned:

| Class: | Number: |
|---|---|
| Common Stock | 350,000 |
| Preferred Stock | |

Please sign exactly as your name or names appear above. For joint accounts, each owner should sign. When signing as executor, administrator, attorney, trustee, guardian or in another representative capacity, please give your full title. Is a corporation or partnership, please sign in the name of the corporation or partnership by an authorized officer or person. Please sign, date and return this proxy card promptly using the enclosed envelope.

Exhibit B

December 13, 2006

Richard York
Secretary
MEMS USA, Inc.
5701 Lindero Canyon Road, Suite 2-100
Westlake Village, California

Re:    MEMS USA, Inc., a Nevada Corporation

Dear Mr. York:

On behalf of the holders of two thirds of the outstanding shares of stock in MEMS USA, Inc. (the "Company") entitled to vote, we hereby submit this written statement notifying you that:

1.    All sitting directors of the Company are hereby terminated from the Board of Directors, including, without limitation, the Chairman of the Board of Directors; and

2.    Thomas Hemingway and Daniel K. Moscaritolo are hereby named directors of the Company.

This action is taken pursuant to Section 3.5 of the bylaws of the Company, which provides that the holders of two-thirds of the outstanding shares of stock entitled to vote may peremptorily terminate the term of office of any director by written statement filed with the secretary and that such removal is effective immediately. That provision of the bylaws further provides that the shareholders are authorized to fill any vacancy resulting from such a termination, and they can elect a director to fill any vacancy at any time. This action is also taken pursuant to Section 2.10 of the bylaws, which authorizes the shareholders to take any action which may be taken by way of a shareholder meeting by written consent.

For your information, we provide documentation reflecting that 152 shareholders, holding 11,373,661 shares of stock, constituting 67.2% of 16,922,987 shares issued and outstanding, have provided written consented for the foregoing action.

Sincerely,

Thomas Hemingway, Gary Cohee, and Daniel Moscaritolo

# ACTION BY UNANIMOUS WRITTEN CONSENT
## OF THE BOARD OF DIRECTORS
### OF
## MEMS USA, INC., now known as CONVERGENCE ETHANOL, INC.
### A Nevada corporation

In accordance with Article IV, Sections 4.10, 8.1 and 8.3 of the Bylaws of the Company, the undersigned, being all of the members of the Board (the "Board") of Mems USA, Inc., now known as Convergence Ethanol, Inc. (the "Company"), hereby take the following actions and adopt the following resolutions by unanimous written consent without a meeting effective for all purposes as of December 13, 2006:

**Termination of Officer**

> **RESOLVED:** That James Laddy is hereby terminated from his position as Chief Executive Officer of the Company and from any other officer or employee position he may hold with the Company effective immediately after the execution of this Action by Unanimous Written Consent.

**Appointment of Officers**

> **RESOLVED:** That the following persons are elected as executive officers of the Company to the office set forth opposite his name, to serve until a successor is duly elected and qualified:

> | | |
> |---|---|
> | Chief Executive Officer and President: | Thomas Hemingway |
> | Secretary: | Daniel Moscaritolo |

*Omnibus Resolutions*

> **RESOLVED:** That the proper officers of the Company be, and hereby are, authorized and directed to execute and deliver, any and all certificates, documents or undertakings of any kind and nature whatsoever and to do and perform or cause to be done and performed all acts, deeds and things, in the name and on behalf of the Company or otherwise as such officers of the Company may deem necessary or appropriate for the foregoing purposes.

This Written Consent may be executed in counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one instrument.

This Written Consent shall be filed in the Minute Book of the Company.

Thomas Hemingway, Director

Daniel Moscaritolo, Director

Exhibit C

**TABLE OF CONTENTS**
**BY-LAWS**

ARTICLE ONE - OFFICES

    1.1       Registered Office.
    1.2       Other Offices.

ARTICLE TWO - MEETINGS OF STOCKHOLDERS

    2.1       Place.
    2.2       Annual Meetings.
    2.3       Special Meetings.
    2.4       Notices of Meetings.
    2.5       Purpose of Meetings.
    2.6       Quorum.
    2.7       Voting.
    2.8       Share Voting.
    2.9       Proxy.
    2.10     Written Consent in Lieu of Meeting.

ARTICLE THREE - DIRECTORS

    3.1       Powers.
    3.2       Number of Directors.
    3.3       Vacancies.

ARTICLE FOUR - MEETINGS OF THE BOARD OF DIRECTORS

    4.1       Place.
    4.2       First Meeting.
    4.3       Regular Meetings.
    4.4       Special Meetings.
    4.5       Notice.
    4.6       Waiver.
    4.7       Quorum.
    4.8       Adjournment.

ARTICLE FIVE - COMMITTEES OF DIRECTORS

    5.1       Power to Designate.
    5.2       Regular Minutes.
    5.3       Written Consent.

ARTICLE SIX - COMPENSATION OF DIRECTORS

    6.1       Compensation.

ARTICLE SEVEN - NOTICES

    7.1      Notice.
    7.2      Consent.
    7.3      Waiver of Notice.

ARTICLE EIGHT - OFFICERS

    8.1      Appointment of Officers.
    8.2      Time of Appointment.
    8.3      Additional Officers.
    8.4      Salaries.
    8.5      Vacancies.
    8.6      Chairman of the Board.
    8.7      Vice-Chairman.
    8.8      President.
    8.9      Vice-President.
    8.10    Secretary.
    8.11    Assistant Secretaries.
    8.12    Treasurer.
    8.13    Surety.
    8.14    Assistant Treasurer.

ARTICLE NINE - CERTIFICATES OF STOCK

    9.1      Share Certificates.
    9.2      Transfer Agents.
    9.3      Lost or Stolen Certificates.
    9.4      Share Transfers.
    9.5      Voting Shareholder.
    9.6      Shareholders Record.

ARTICLE TEN - GENERAL PROVISIONS

    10.1    Dividends
    10.2    Reserves.
    10.3    Checks.
    10.4    Fiscal Year.
    10.5    Corporate Seal.

ARTICLE ELEVEN - INDEMNIFICATION

ARTICLE TWELVE - AMENDMENTS

    12.1    By Shareholder.
    12.2    By Board of Directors.

# BY-LAWS

## OF

## MEMS USA, Inc.

A NEVADA CORPORATION

### ARTICLE ONE
### OFFICES

Section 1.1 <u>Principal Office</u> - The principal office of MEMS USA, Inc. (the "Corporation") shall be located in such state or county as the Board of Directors of the Corporation may designate. The Corporation may have such other offices, either within or without Nevada, as the Board of Directors of the Corporation may designate or as the business of the Corporation may require from time to time.

Section 1.2 <u>Other Offices</u> - The corporation may also have offices at such other places both within and without the State of Nevada as the Board of Directors may from time to time determine or the business of the corporation may require.

### ARTICLE TWO
### MEETINGS OF STOCKHOLDERS

Section 2.1 <u>Place</u> - All annual meetings of the stockholders shall be held at registered office of the corporation or at such other place within or without the State of Nevada as the directors shall determine. Special meetings of the stockholders may be held at such time and place within or without the State of Nevada as shall be stated in the notice of the meeting, or in a duly executed waiver of notice thereof.

Section 2.2 <u>Annual Meetings</u> - Annual meetings of the stockholders, commencing with the year 2006, shall be held on the 18th day of February each year if not legal holiday and, if a legal holiday, then on the next secular day following, or at such other time as may be set by the Board of Directors from time to time, at which the stockholders shall elect by vote a Board of Directors and transact such other business as may properly be brought before the meeting.

Section 2.3 <u>Special Meetings</u> - Special meetings of the stockholders, for any purpose or purposes, unless otherwise prescribed by statute or by the Articles of Incorporation, may be called by the President or the Secretary by resolution of the Board of Directors or at the request in writing of stockholders owning a majority in amount of the entire capital stock of the corporation issued and outstanding and entitled to vote. Such request shall state the purpose of the purposed meeting.

Section 2.4 <u>Notices of Meetings</u> - Notices of meetings shall be in writing and signed by the President or a Vice-President or the Secretary or an Assistant Secretary or by such other person or persons as the directors shall designate. Such notice shall state

the purpose or purposes for which the meeting is called and the time and the place, which may be within or without this State, where it is to be held. A copy of such notice shall be either delivered personally to or shall be mailed, postage prepaid, to each stockholder of record entitled to vote at such meeting not less than ten nor more than sixty days before such meeting. If mailed, it shall be directed to a stockholder at his address as it appears upon the records of the corporation and upon such mailing of any such notice, the service thereof shall be complete and the time of the notice shall begin to run from the date upon which such notice is deposited in the mail for transmission to such stockholder. Personal delivery of any such notice to any officer of a corporation or association or to any member of a partnership shall constitute delivery of such notice to such notice of and prior to the holding of the meeting it shall not be necessary to deliver or mail notice of the meeting to the transferee.

Section 2.5. Purpose of Meetings - Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

Section 2.6. Quorum - The holders of a majority of the stock issued and outstanding and entitled to vote there at, present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business except as otherwise provided by statute or by the Articles of Incorporation. If, however, such quorum shall not be present or represented at any meeting of the stockholders, the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally notified.

Section 2.7 Meetings by Telecommunications. Any or all shareholders may participate in an annual or special meeting by, or conduct the meeting through the use of, any means of communication by which all shareholders participating may hear each other during the meeting. A shareholder participating in a meeting by this means is deemed to be present in person at the meeting.

Section 2.7. Voting - When a quorum is present or represented at any meeting, the vote of the holders of a majority of the stock having voting power present in person or represented by proxy shall be sufficient to elect directors or to decide any questions brought before such meeting, unless the question is one upon which by express provision of the statutes or of the Articles of Incorporation, a different vote is required in which case such express provision shall govern and control the decision of such question.

Section 2.8. Share Voting - Each stockholder of record of the corporation shall be entitled at each meeting of stockholders to one vote for each share of stock standing in his name on the books of the corporation. Upon the demand of any stockholder, the vote for directors and the vote upon any question before the meeting shall be by ballot.

Section 2.9. Proxy - At the meeting of the stockholders any stockholder may be presented and vote by a proxy or proxies appointed by an instrument in writing. In the event that any such instrument in writing shall designate two or more persons to act as proxies, a majority of such persons present at the meeting, or, if only one shall be present,

then that one shall have and may exercise all of the powers conferred by such written instrument upon all of the persons so designated unless the instrument shall otherwise provide. No proxy or power of attorney to vote shall be used to vote at a meeting of the stockholders unless it shall have been filed with the secretary of the meeting when required by the inspectors of election. All questions regarding the qualification of voters, the validity of proxies and the acceptance or rejection of votes shall be decided by the inspectors of election who shall be appointed by the Board of Directors, or if not so appointed, then by the presiding officer of the meeting.

Section 2.10.  <u>Written Consent in Lieu of Meeting</u> - Any action which may be taken by the vote of the stockholders at a meeting may be taken without a meeting if authorized by the written consent of stockholders holding at least a majority of the voting power, unless the provisions of the statutes or of the Articles of Incorporation require a greater proportion of voting power to authorize such action in which case such greater proportion of written consents shall be required.

ARTICLE THREE
DIRECTORS

Section 3.1.  <u>Powers</u> - The business of the corporation shall be managed by its Board of Directors which may exercise all such powers of the corporation and do all such lawful acts and things as are not by statute or by the Articles of Incorporation or by these Bylaws directed or required to be exercised or done by the stockholders.

Section 3.2  <u>Nomination of Directors</u>. Only persons who are nominated in accordance with the following procedures shall be eligible for election as Directors. Nomination for election to the Board of Directors of the Corporation at a meeting of shareholders may be made by the Board of Directors or by any shareholder of the Corporation entitled to vote for the election of Directors at such meeting who complies with the notice procedures set forth in this Section. Such nominations, other than those made by or on behalf of the Board of Directors, shall be made by notice in writing delivered or mailed by first class United States mail, postage prepaid, to the Secretary, and received not less than 60 days nor more than 90 days prior to such meeting; provided, however, that if less than 70 days' notice or prior public disclosure of the date of the meeting is given to shareholders, such nomination shall have been mailed or delivered to the Secretary not later than the close of business on the 10th day following the date on which the notice of the meeting was mailed or such public disclosure was made, whichever occurs first. Such notice shall set forth (a) as to each proposed nominee (i) the name, age, business address and, if known, residence address of each such nominee, (ii) the principal occupation or employment of each such nominee, (iii) the number of shares of the Corporation which are beneficially owned by each such nominee, and (iv) any other information concerning the nominee that must be disclosed as to nominees in proxy solicitations pursuant to Regulation 14A under the Securities Exchange Statutes of 1934, as amended (including such person's written consent to be named as a nominee and to serve as a Director if elected); and (b) as to the shareholder giving the notice (i) the name and address, as they appear on the Corporation's books, of such shareholder and (ii) the class and number of shares of the Corporation which are beneficially owned by such shareholder. The Corporation may require any proposed nominee to furnish such other information as may reasonably be required by the

Corporation to determine the eligibility of such proposed nominee to serve as a Director of the Corporation. The Chairman of the meeting may, if the facts warrant, determine and declare to the meeting that a nomination was not made in accordance with the foregoing procedure, and if he or she should so determine, he or she shall so declare to the meeting and the defective nomination shall be disregarded.

Section 3.3. Number of Directors - The authorized number of Directors shall be not less than three nor more than thirteen; provided, however, that if the Corporation has less than three shareholders entitled to vote for the election of directors, the Board of Directors may consist of a number of individuals equal to or greater than the number of those shareholders. The current number of Directors shall be within the limits specified above, as determined (or as amended from time-to-time) by resolution adopted by the Directors. Subject to any contractual obligations of the Corporation, the number of Directors may be decreased at any time and from time to time by a majority of the Directors then in office, but only to eliminate vacancies existing by reason of the death, resignation, removal or expiration of the term of one or more directors. The directors shall be elected at the annual meeting of the shareholders by such shareholders as have the right to vote on such election. Directors need not to be residents of Nevada or shareholders of the Corporation.

Section 3.5 Term – Directors shall serve staggered three year terms.

Section 3.4. Resignation - A director may resign at any time by giving a written notice of resignation to the Corporation. Such a resignation is effective when the notice is received by the Corporation unless the notice specifies a later effective date, and the acceptance of such recognition shall not be necessary to make it effective.

Section 3.5. Vacancies - Vacancies in the Board of Directors including those caused by an increase in the number of directors, may be filled by a majority of the remaining directors, though less than a quorum, or by a sole remaining director, and each director so elected shall hold office until his successor is elected at an annual or a special meeting of the stockholders. The holders of a two-thirds of the outstanding shares of stock entitled to vote may at any time peremptorily terminate the term of office of all or any of the directors by vote at a meeting called for such purpose or by a written statement filed with the secretary or, in his absence, with any other officer. Such removal shall be effective immediately, even if successors are not elected simultaneously and vacancies on the Board of Directors resulting there from shall be filled only by the stockholders.

A vacancy or vacancies in the Board of Directors shall be deemed to exist in case of the death, resignation or removal of any directors, or if the authorized number of directors be increased, or if the stockholders fail at any annual or special meeting of stockholders at which any director or directors are elected to elect the full authorized number of directors to be voted for at that meeting.

The stockholders may elect a director or directors at any time to fill any vacancy or vacancies not filled by the directors. If the Board of Directors accepts the resignation of a director tendered to take effect at a future time, the Board or the stockholders shall have power to elect a successor to take office when the resignation is to become effective.

No reduction of the authorized number of directors shall have the effect of removing any director prior to the expiration of his term of office.

## ARTICLE FOUR
## MEETINGS OF THE BOARD OF DIRECTORS

Section 4.1. Place - Regular meetings of the Board of Directors shall be held at any place within or without the State which has been designated from time to time by resolution of the Board or by written consent of all members of the Board. In the absence of such designation regular meetings shall be held at the registered office of the corporation. Special meetings of the Board may be held either at a place so designated or at the registered office.

Section 4.2. First Meeting - The first meeting of each newly elected Board of Directors shall be immediately following the adjournment of the meeting of stockholders and at the place thereof. No notice of such meeting shall be necessary to the directors in order legally to constitute the meeting, provided a quorum be present. In the event such meeting is not so held, the meeting may be held at such time and place as shall be specified in a notice given as hereinafter provided for special meetings of the Board of Directors.

Section 4.3. Regular Meetings - Regular meetings of the Board of Directors may be held without call or notice at such time and at such place as shall from time to time be fixed and determined by the Board of Directors.

Section 4.4. Special Meetings - Special Meetings of the Board of Directors may be called by the Chairman or the President or by any Vice-President or by any two directors.

Written notice of the time and place of special meetings shall be delivered personally to each director, or sent to each director by mail, electronic mail, facsimile or by other form of written communication, charges prepaid, addressed to him at his address as it is shown upon the records or if not readily ascertainable, at the place in which the meetings of the directors are regularly held. In case such notice is mailed or telegraphed, it shall be deposited in the United States mail or delivered to the telegraph company at least forty-eight (48) hours prior to the time of the holding of the meeting. In case such notice is delivered as above provided, it shall be so delivered at least twenty-four (24) hours prior to the time of holding of the meeting. Such mailing, telegraphing or delivery as above provided shall be due, legal and personal notice to such director.

Section 4.5. Notice - Notice of the time and place of holding an adjourned meeting need not be given to the absent directors if the time and place be fixed at the meeting adjourned.

Section 4.6. Waiver - The transactions of any meeting of the Board of Directors, however called and noticed or wherever held, shall be as valid as though had a meeting duly held after regular call and notice, if a quorum be present, and if, either before or after the meeting, each of the directors not present signs a written waiver of notice, or a consent to holding such meeting, or an approval of the minutes thereof. All such waivers, consents or approvals shall be filed with the corporate records or made a part of the

minutes of the meeting.

Section 4.7. <u>Quorum -</u> A majority of the authorized number of directors shall be necessary to constitute a quorum for the transaction of business, except to adjourn as hereinafter provided. Every act or decision done or made by a majority of the directors present at a meeting duly held at which a quorum is present shall be regarded as the act of the Board of Directors, unless a greater number is required by law or by the Articles of Incorporation. Any action of a majority, although not at a regularly called meeting, and the record thereof, if assented to in writing by all of the other members of the Board shall be as valid and effective in all respects as if passed by the Board in regular meeting.

Section 4.8. <u>Presumption of Assent.</u> A director who is present at a meeting of the Board of Directors or a committee of the Board of Directors when corporate action is taken is deemed to have assented to the action taken unless: (1) the director objects at the beginning of the meeting, or promptly upon his or her arrival, to holding or transacting business at the meeting and does not thereafter vote for or assent to any action taken at the meeting; (2) the director contemporaneously requests that his or her dissent or abstention as to any specific action be entered in the minutes of the meeting; or (3) the director causes written notice of his or her dissent or abstention as to any specific action be received by the presiding officer of the meeting before its adjournment or to the Corporation immediately after adjournment of the meeting. The right of dissent or abstention is not available to a director who votes in favor of the action taken.

Section 4.9. <u>Meetings by Telecommunications.</u>  Any or all directors may participate in a regular or special meeting by, or conduct the meeting through the use of, any means of communication by which all directors participating may hear each other during the meeting. A director participating in a meeting by this means is deemed to be present in person at the meeting.

Section 4.10 <u>Action Without a Meeting.</u> Any action required or permitted to be taken by the Board of Directors at a meeting may be taken without a meeting if all the directors consent to such action in writing. Action taken by written consent is effective when the last director signs the consent, unless, prior to such time, any director has revoked a consent by a signed writing received by the Corporation, or unless the consent specifies a different effective date. A signed consent has the effect of an action taken at a meeting of directors and may be described as such in any document.

Section 4.11. <u>Adjournment -</u> A quorum of the directors may adjourn any directors meeting to meet again at a stated day and hour; provided, however, that in the absence of a quorum, a majority of the directors present at any directors meeting, either regular or special, may adjourn from time to time until the time fixed for the next regular meeting of the Board.

6 of 15

## ARTICLE FIVE
### COMMITTEES OF DIRECTORS

Section 5.1. <u>Power to Designate</u> - The Board of Directors may, by resolution adopted by a majority of whole Board, designate one or more committees of the Board of Directors, each committee to consist of one or more of the directors of the corporation which, to the extent provided in the resolution, shall have and may exercise the power of the Board of Directors in the management of the business and affairs of the corporation and may have power to authorize the seal of the corporation to be affixed to all papers which may require it. Such committees shall have such name or names as may be determined from time to time by the Board of Directors. The members of any such committee present at any meeting and not disqualified from voting may, whether or not they constitute a quorum, unanimously appoint another member of the Board of Directors to act at the meeting in the place of any absent or disqualified member. At meetings of such committees, a majority of the members or alternate members shall constitute a quorum for the transaction of business, and the act of a majority of the members or alternate members at any meeting at which there is a quorum shall be the act of the committee.

Section 5.2. <u>Regular Minutes</u> - The committees shall keep regular minutes of their proceedings and report the same to the Board of Directors.

Section 5.3. <u>Written Consent</u> - Any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting if a written consent thereto is signed by all members of the Board of Directors or of such committee, as the case may be, and such written consent is filed with the minutes of proceedings of the Board or committee.

## ARTICLE SIX
### COMPENSATION OF DIRECTORS

Section 6.1. <u>Compensation</u> - The directors may be paid their expenses of attendance at each meeting of the Board of Directors and may be paid a fixed sum for attendance at each meeting of the Board of Directors or a stated salary as director. No such payment shall prelude any director from serving the corporation in any other capacity and receiving compensation therefore. Members of special or standing committees may be allowed like reimbursement and compensation for attending committee meetings.

## ARTICLE SEVEN
### NOTICES

Section 7.1. <u>Notice</u> - Notices to directors and stockholders shall be in writing and delivered personally or mailed to the directors or stockholders at their addresses appearing on the books of the corporation. Notice by mail shall be deemed to be given at the time when the same shall be mailed. Notice to directors may also be given by telegram or via electronic mail.

Section 7.2. <u>Consent</u> - Whenever all parties entitled to vote at any meeting, whether of directors or stockholders, consent, either by a writing on the records of the meeting or filed with the secretary, or by presence at such meeting and oral consent entered on the minutes, or by taking part in the deliberations at such meeting without objection, the doings of such meetings shall be as valid as if they had occurred at a meeting regularly called and noticed, and at such meeting any business may be transacted which is not excepted from written consent or to the consideration of which no objection for want of notice is made at the time, and if any meeting be irregular for want of notice or of such consent, provided a quorum was present at such a meeting, the proceedings of said meeting may be ratified and approved and rendered likewise valid and the irregularity of defect therein waived by a writing signed by all parties having the right to vote at such meeting; and such consent or approval of stockholders may be by proxy or attorney, but all such proxies and powers of attorney must be in writing.

Section 7.3. <u>Waiver of Notice</u> - Whenever any notice whatsoever is required to be given under the provisions of the statutes, of the Articles of Incorporation or of these Bylaws, a waiver thereof in writing, signed by the person or persons entitled to said notice, whether before or after the time stated therein, shall be deemed equivalent thereto.

ARTICLE EIGHT
OFFICERS

Section 8.1. <u>Appointment of Officers</u> - The officers of the corporation shall be chosen by the Board of Directors and shall be the Chief Executive Officer, President, Secretary and a Treasurer or Chief Financial Officer. Any person may hold two or more offices.

Section 8.2. <u>Term of Office.</u> The officers of the Corporation shall be appointed by the Board of Directors for a term as determined by the Board of Directors. The designation of a specified term does not grant to the officer any contractual rights, and the Board can remove the officer at any time prior to the termination of such term. If no term is specified, the officer shall hold office until he or she resigns, dies or until he or she is removed in the manner provided in section 8.3 of these Bylaws.

Section 8.3. <u>Removal.</u> Any officer or agent may be removed by the Board of Directors at any time, with or without cause. Such removal shall be without prejudice to the contract rights, if any, of the person so removed. Appointment of an officer or agent shall not of itself create contract rights.

Section 8.4. <u>Resignation.</u> Any officer may resign at any time, subject to any rights or obligations under any existing contracts between the officer and the Corporation, by giving notice to the Chief Executive Officer, President or the Board of Directors. An officer's resignation shall be effective when received by the Corporation, unless the notice specifies a later effective date, and the acceptance of such resignation shall not be necessary to make it effective.

8 of 15

Section 8.5. <u>Time of Appointment</u> - The Board of Directors at its first meeting after each annual meeting of stockholders shall choose a Chairman of the Board who shall be a director, and shall choose a Chief Executive Officer, President, a Secretary and a Treasurer or Chief Financial Officer, none of whom need be directors.

Section 8.6. <u>Additional Officers</u> - The Board of Directors may appoint a Vice-Chairman of the Board, Vice-Presidents and one or more Assistant Secretaries and Assistant Treasurers and such other officers and agents as it shall deem necessary who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Directors.

Section 8.4. <u>Salaries</u> - The salaries and compensation of all officers of the corporation shall be fixed by the Board of Directors.

Section 8.5. <u>Vacancies</u> - The officers of the corporation shall hold office at the pleasure of the Board of Directors. Any officer elected or appointed by the Board of Directors. Any vacancy occurring in any office of the corporation by death, resignation, removal or otherwise shall be filled by the Board of Directors.

Section 8.6. <u>Chairman of the Board</u> - The Chairman of the Board shall preside at meetings of the stockholders and the Board of Directors, and shall see that all orders and resolutions of the Board of Directors are carried into effect.

Section 8.7. <u>Vice-Chairman</u> - The Vice-Chairman shall, in the absence or disability of the Chairman of the Board, perform the duties and exercise the powers of the Chairman of the Board and shall perform such other duties as the Board of Directors may from time to time prescribe.

Section 8.8. <u>Chief Executive Officer</u>. The Chief Executive Officer shall, subject to the control of the Board of Directors, in general supervise and control all of the business and affairs of the Corporation. Unless there is a Chairman of the Board, the Chief Executive Officer shall, when present, preside at all meetings of the shareholders and of the Board of Directors. In general, the Chief Executive Officer shall perform all duties incident to the office of the Chief Executive Officer and such other duties as may be prescribed by the Board of Directors from time to time.

Section 8.9 <u>President.</u> The President shall, subject to the direction of the Board of Directors, have general and active control of the internal day-to-day business and affairs of the Corporation and the general supervision of its employees and agents. The President shall see that all resolutions of the Board of Directors are carried into effect as they pertain to the day-to-day business and operations of the Corporation, and, in addition, shall have all the powers and perform all the duties generally appertaining to the office of the President of a corporation. The President shall make annual reports and submit the same to the Chief Executive Officer and Board of Directors and to the shareholders at their annual meeting, showing the condition and affairs of the Corporation. He or she shall from time to time make such recommendations to the Chief Executive Officer, the Board of Directors, and such other persons as he or she thinks proper and shall bring before the Chief Executive Officer and the Board of Directors

such information as may be required or appropriate, relating to the business and property of the Corporation.

Section 8.10. Vice-President - The Vice-President shall act under the direction of the President and in the absence or disability of the President shall perform the duties and exercise the powers of the President. They shall perform such other duties and have such other powers as the President or the Board of Directors may from time to time prescribe. The Board of Directors may designate one or more Executive Vice-Presidents or may otherwise specify the order of seniority of the Vice-Presidents. The duties and powers of the President shall descend to the Vice-Presidents in such specified order of seniority.

Section 8.11. Secretary - The Secretary shall act under the direction of the President. Subject to the direction of the President he shall attend all meetings of the Board of Directors and all meetings of the stockholders and record the proceedings. He shall perform like duties for the standing committees when required. He shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the President or the Board of Directors.

Section 8.12. Assistant Secretaries - The Assistant Secretaries shall act under the direction of the President. In order of their seniority, unless otherwise determined by the President or the Board of Directors, they shall, in the absence or disability of the Secretary, perform such other duties and exercise the powers of the Secretary. They shall perform such other duties and have such other powers as the President or the Board of Directors may from time to time prescribe.

Section 8.13. Treasurer or Chief Financial Officer - the Treasurer or Chief Financial Officer shall act under the direction of the President. Subject to the direction of the President he shall have custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the corporation and shall deposit all monies and other valuable effects in the name and to the credit of the corporation in such depositories as may be designated by the Board of Directors. He shall disburse the funds of the corporation as may be ordered by the President or the Board of Directors, taking proper vouchers for such disbursements, and shall render to the President and the Board of Directors, at its regular meetings, or when the Board of directors so requires, an account of all his transactions as Treasurer and of the financial condition of the corporation.

Section 8.14. Surety - If required by the Board of Directors, he shall give the corporation a bond in such sum surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of his office and for the restoration to the corporation, in case of his death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his possession or under his control belonging to the corporation.

Section 8.15. Assistant Treasurer or Controller - The Assistant Treasurer or Controller, shall assist the Treasurer or Controller, and shall, unless otherwise determined by the President or the Board of Directors, in the absence or disability of the Treasurer, perform the duties and exercise the powers of the Treasurer. They shall perform such other duties and have such other powers as the President or the Board of Directors may

from time to time prescribe.

## ARTICLE NINE
## CERTFICATES OF STOCK

**Section 9.1. Share Certificates** - Every stockholder shall be entitled to have a certificate signed by the President or a Vice-President and the Treasurer or an Assistant Treasurer, or the Secretary of the corporation, certifying the number of shares owned by him in the corporation. If the corporation shall be authorized to issue more than one class of stock or more than one series of any class, the designations, preferences and relative, participating, optional or other special rights of the various classes of stock or series thereof and the qualifications, limitations or restrictions of such rights, shall be set forth in full or summarized on the face or back of certificate which the corporation shall issue to represent such stock.

**Section 9.2. Transfer Agents** - If a certificate is signed (a) by a transfer agent other than the corporation or its employees or (b) by a registrar other than the corporation or its employees, the signatures of the officers of the corporation may be facsimiles. In case any officers who has signed or whose facsimile signature has been placed upon a certificate shall cease to be such officer before such certificate is issued, such certificate may be issued with the same effect as though the person had not ceased to be such officer. The seal of the corporation, or a facsimile thereof, may, but need not be, affixed to certificates of stock.

**Section 9.3. Lost or Stolen Certificates** - The Board of directors may direct a new certificate or certificates to be issued in place of any certificate or certificates theretofore issued by the corporation alleged to have been lost or destroyed upon the making of an affidavit to that fact by the person claiming the certificate of stock to be lost or destroyed. When authorizing such issue of a new certificate or certificates, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost or destroyed certificate or certificates, or his legal representative, to advertise the same in such manner as it shall require and/or give the corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the corporation with respect to the certificate alleged to have been lost or destroyed.

**Section 9.4. Share Transfers** - Upon surrender to the corporation or the transfer agent of the corporation of a certificate for shares duly endorsed or accompanied by proper evidence of succession, assignment or authority to transfer, it shall be the duly of the corporation, if it is satisfied that all provisions of the laws and regulations applicable to the corporation regarding transfer and ownership of shares have been complied with, to issue a new certificate to the person entitled thereto, cancel the old certificate and record the transaction upon its books.

**Section 9.5. Voting Shareholder** - The Board of Directors may fix in advance a date not exceeding sixty (60) days nor less than ten (10) days preceding the date of any meeting of stockholders, or the date for the payment of any dividend, or date for the allotment of rights, or the date when any change or conversion or exchange of capital stock shall go into effect, or a date in connection with obtaining the consent of

stockholders for any purpose, as a record date for determination of the stockholders entitled to receive payment of any such meeting, and any adjournment thereof, or entitled to receive payment of any such dividend, or to give such consent, and in such case, such stockholders, and only such stockholders as shall be stockholder of record on the date so fixed, shall be entitled to notice of and to vote at such meeting, or any adjournment thereof, or to receive payment of such dividend, or to receive such allotment of rights, or to exercise such rights, or to give such consent, as the case may be, notwithstanding any transfer of any stock on the books of the corporation after any such record date fixed as aforesaid.

Section 9.6. <u>Shareholders Record</u> - The corporation shall be entitled to recognize the person registered on its books as the owner of shares to be the exclusive owner for all purposes including voting and dividends, and the corporation shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of Nevada.

ARTICLE TEN
GENERAL PROVISIONS

Section 10.1. <u>Dividends</u> - Dividends upon the capital stock of the corporation, subject to the provisions of the Articles of Incorporation, if any, may be declared by the Board of Directors at any regular or special meeting, pursuant to law. Dividends may be paid in cash, in property or in shares of the capital stock, subject to the provisions of the Articles of Incorporation.

Section 10.2. <u>Reserves</u> - Before payment of any dividend, there may be set aside out of any funds of the corporation available for dividends such sum or sums as the directors from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends or for repairing or maintaining any property of the corporation or for such other purpose as the directors shall think conducive to the interest of corporation, and the directors may modify or abolish any such reserve in the manner in which it was created.

Section 10.3. <u>Checks</u> - All checks or demands for money and notes of the corporation shall be signed by such officer or officers or such other person or persons as the Board of Directors may from time to time designate.

Section 10.4. <u>Fiscal Year</u> - The fiscal year of the corporation shall be fixed by resolution of the Board of Directors.

Section 10.5. <u>Corporate Seal</u> - The corporation may or may not have a corporate seal, as may from time to time be determined by resolution of the Board of Directors. If a corporate seal is adopted, it shall have inscribed thereon the name of the Corporation and the words "Corporate Seal" and "Nevada". The seal may be used by causing it or a facsimile thereof to be impressed or affixed or in any manner reproduced.

Section 10.6 <u>Inspection of Records by Shareholders and Directors.</u> A shareholder or director of a Corporation is entitled to inspect and copy, during regular business hours at the Corporation's principal office, any of the records of the Corporation

12 of 15

required to be maintained by the Corporation under the Statutes and which are subject to inspection and copy under the Statutes. The scope of and requirements for such inspection right (including any required notice or purposes) shall be as provided under the Statutes.

## ARTICLE ELEVEN
## INDEMNIFICATION

Every person who was or is a party or is threatened to be made a party to or is involved in any action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that he or a person of whom he is the legal representative is or was a director or officer of the corporation or is or was serving at the request of the corporation or for its benefit as a director or officer of another corporation, or as its representative in a partnership, joint venture, trust or other enterprise, shall be indemnified and held harmless to the fullest extent legally permissible under the General Corporation Law of the State of Nevada from time to time against all expenses, liability and loss (including attorneys' fees, judgments, fines and amounts paid or to be paid in settlement) reasonably incurred in defending a civil or criminal action, suit or proceeding must be paid by the corporation as they are incurred and in advance of the final disposition of the action, suit or proceeding upon receipt of an undertaking by or on behalf of the director or officer to repay the amount if it is ultimately determined by a court of competent jurisdiction that he is not entitled to be indemnified by the corporation. Such right of indemnification shall be a contract right which may be enforced in any manner desired by such person. Such right of indemnification shall not be exclusive of any other right which such directors, officers or representatives may have or hereafter acquire and, without limiting the generality of such statement, they shall be entitled to their respective rights of indemnification under any bylaw, agreement, vote of stockholders, provision of law or otherwise, as well as their rights under this Article.

The Board of Directors may cause the corporation to purchase and maintain insurance on behalf of any person who is or was a director or officer of the corporation, or is or was serving at the request of the corporation as a director or officer of another corporation, or as its representative in a partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred in any such capacity or arising out of such status, whether or not the corporation would have the power to indemnify such person.

The Board of Directors may from time to time adopt further Bylaws with respect to indemnification and may amend these and such Bylaws to provide at all times the fullest indemnification permitted by the General Corporation Law of the State of Nevada.

## ARTICLE TWELVE
## AMENDMENTS

Section 12.1. By Shareholder - The Bylaws may be amended by a majority vote of an the stock issued and outstanding and entitled to vote at any annual or special meeting of the stockholders, provided notice of intention to amend shall have been

contained in the notice of the meeting.

Section 12.2. <u>By Board of Directors</u> - The Board of Directors by a majority vote of the whole Board at any meeting may repeal or amend these Bylaws, including Bylaws adopted by the stockholders, but the stockholders may from time to time specify particular provisions of the Bylaws which shall not be amended by the Board of Directors.

## CERTIFICATE OF SECRETARY

I hereby certify that I am the Secretary of MEMS USA, Inc. and that the foregoing Bylaws, consisting of 14 pages, constitute the Bylaws of MEMS USA, Inc., as duly adopted at a regular meeting the Board of Directors of the corporation held March 1, 2004.

IN WITNESS WHEREOF, I have hereunto subscribed my name this 1st day of March, 2004.

Daniel Moscaritolo
Secretary

15 of 15

1 | Timothy M. McCloskey (*Pro Hac Vice*)
John Roberson (*Pro Hac Vice*)
2 | Blake E. Rizzo (*Pro Hac Vice*)
Carrigan McCloskey & Roberson, L.L.P.
3 | 5300 Memorial, Suite 700
Houston, Texas 77007
4 | Telephone: (713) 337-3919
Facsimile: (713) 868-1275
5 | brizzo@cmrllp.com
6 |

7 | Paul R. Kiesel (SBN 119854)
Kiesel Boucher Larson
8 | 8648 Wilshire Blvd.
Beverly Hills, CA 90211
9 | Telephone: (310) 854-4444
Facsimile: (310) 854-0812
10 | kiesel@kbla.com

11 | Attorneys for Plaintiff
12 | RONALD J. SOMMERS, CHAPTER 7 TRUSTEE FOR
CONVERGENCE ETHANOL, INC.,
13 |

14 | **UNITED STATES DISTRICT COURT**

15 | **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

16 | CONVERGENCE ETHANOL, INC., a    Case No. CV 06-07971
17 | Nevada corporation

18 |     Plaintiff,    [The Honorable George H. Wu]

19 |     vs.    **CERTIFICATE OF SERVICE**

20 |

21 | DANIEL MOSCARITOLO, an
individual; and DOES 1 through 10,
22 |

23 |     Defendants.

24 |

25 | AND RELATED COUNTER-
ACTION.
26 |

27 |

28 |

## CERTIFICATE OF SERVICE

I am employed in the County of Harris, State of Texas. I am over the age of 18 and not a party to the within action.  My business address is 5300 Memorial Drive, Suite 700, Houston, Texas 77007.

I served on July 7, 2008 the foregoing document described as:

(1)    FIRST AMENDED COMPLAINT

on the interested parties by filing with the Court a true and correct copy thereof and causing a true and correct copy to be delivered to the addressed as follows:

Steven S. Newsom
Steven S. Newsom Law Office
12000 Westheimer Road, Suite 232
Houston, TX 77077

Laura G. Brys
Burris, Schoenberg & Walden, LLP
12121 Wilshire Blvd, Suite 800
Los Angeles, CA 90025-1171

[ ]  **VIA OVERNIGHT MAIL:**
VIA: By delivering such documents to an overnight mail service or an authorized courier in an envelope or package designated by the express service courier addressed to the person(s) on whom it is to be served.

[X]  **VIA U.S. MAIL:**
I am readily familiar with the firm's practice for collection and processing of correspondence for mailing. Under that practice, such envelope(s) would be deposited with the U.S. postal service with postage thereon fully prepaid, at Houston, TX.

[ ]  **VIA PERSONAL DELIVERY:**
I personally delivered such envelope(s) by hand to the offices of the addressee pursuant to CCP § 1011.

[ ]  **VIA ELECTRONIC MAIL:**
I personally served upon all parties the above-referenced documents via electronic mail to the e-mail addresses for those individuals noted to have e-mail addresses on the attached Proof of Service List.

[ ]  **VIA FACSIMILE:**

1
2
3
4

The interested parties receiving the above-referenced documents via facsimile have agreed to accept same via facsimile transmission, and the facsimile transmission report indicated that the transmission was complete and without error. A copy of that report, which was properly issued by the transmitting machine, is attached hereto.

5

[X]

**FEDERAL:**

6

I declare that I am employed in the office of a member of the Texas bar appearing in this court pro hac vice at whose direction the service was made.

7

8

I declare under penalty of perjury under the laws of the State of Texas that the above is true and correct and was executed on July 7, 2008, at Houston, TX.

9

10

Sheryl Warren

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CERTIFICATE OF SERVICE
Case No. CV 06-07971